# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN CHENENSKY, individually, and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>NEW YORK LIFE INSURANCE CO., et al.,<br><br>    Defendants. | 07 Civ. 11504 (WHP) |
| AVRAHAM GOLD, individually, and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>NEW YORK LIFE INSURANCE CO., et al.,<br><br>    Defendants. | 09 Civ. 3210 (WHP)<br><br>*Electronically Filed* |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT

MORGAN, LEWIS & BOCKIUS LLP
Richard G. Rosenblatt (pro hac vice)
Sean P. Lynch
502 Carnegie Center
Princeton, New Jersey 08540
Phone: (609) 919-6600
Fax: (609) 919-6701
rrosenblatt@morganlewis.com
slynch@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
Michael L. Banks (pro hac vice)
1701 Market Street
Philadelphia, Pennsylvania 19103
Phone (215) 963-5387
mbanks@morganlewis.com
*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   COUNTERSTATEMENT OF FACTS ...................................................... 2

III.  ARGUMENT ............................................................................................ 3

    A.   Legal Standard for Motion for Summary Judgment .................................... 3

    B.   This Court's Prior Decisions Compel Denial Of Plaintiffs' Motion ...................... 3

    C.   Plaintiffs Misinterpret And Fail To Distinguish <u>Pachter</u> ............................ 6

        1.   Plaintiffs Conflate The Concepts Of Commissions And Compensation ................................................................... 9

        2.   Plaintiffs' Attempt To Distinguish <u>Pachter</u> Is Baseless .............................. 12

        3.   Plaintiffs Testimony And The Parties' Course Of Dealings Establish That Plaintiffs Fully Understood That Their Compensation Would Be Determined Through The Ledger Reconciliation Process And That New York Life Paid Them In Accord With Their Understanding .............. 14

    D.   Plaintiffs' Argument Contravenes New York Insurance Law § 4228 and Decades of Industry Practice ...................................................... 16

    E.   Plaintiffs' Tortured Parsing Of Selected Portions Of Some – But Not All – Relevant Agreements Does Not Come Close To Carrying Their Burden Of Proving That They Must Prevail As A Matter Of Law On Their Claim That New York Life Deducted Amounts From Earned Wages ........................................ 18

        1.   The Agreements And Extrinsic Evidence Do Not Establish That New York Life Deducted Amounts From Plaintiffs' Earned Wages ................................................................... 18

            a.   "Payable" commissions and "Allowed" training allowances do not equate to earned compensation .................................... 18

            b.   That premium receipt is a condition precedent to crediting commissions is immaterial to whether those commission credits are earned under NYLL § 193 ................................ 20

            c.   Plaintiffs fail to identify the moment when they believe that individual commission credits were earned – further confirmation that they understood their compensation was the net of credits and debits on any given pay date .............................. 21

        2.   Plaintiffs' Other Recycled Legal Arguments Do Not Provide A Basis For Summary Judgment In Their Favor ....................................... 22

            a.   Plaintiffs' "Company Store" argument is still flawed and their Section 193 cases are inapposite .................................... 22

# TABLE OF CONTENTS
(continued)

**Page**

b.   Plaintiffs' TAS allowance and expense recompense arguments are without merit ............................................................. 23

c.   Plaintiffs' tired tax withholding argument still lacks merit............. 25

IV.    CONCLUSION............................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)................................................................................................3

Arbeeney v. Kennedy Executive Search Inc.,
893 N.Y.S.2d 39 (App. Div. 1st Dep't 2010) ........................................................23

Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC,
No. 07-6665, 2009 WL 1803458 (S.D.N.Y. June 23, 2009),
aff'd, 402 F. App'x 623 (2d Cir. 2010)..................................................................16

Beckles v. Bennett,
No. 05-2000, 2008 WL 821827 (S.D.N.Y. Mar. 26, 2008)....................................3

Chenensky v. New York Life Ins. Co.,
No. 07-11504, 2009 WL 4975237 (S.D.N.Y. Dec. 22, 2009) ..........................2, 4, 6

Chenensky v. New York Life Ins. Co.,
No. 07-11504, 2011 WL 1795305 (S.D.N.Y. Apr. 27, 2011) ..........................5, 6, 14

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce,
Fenner & Smith Inc.,
232 F.3d 153 (2d Cir. 2000)....................................................................................6

Elliott Co. v. Liberty Mut. Ins. Co.,
No. 05-1387, 2007 WL 987318 (N.D. Ohio Apr. 2, 2007) ....................................15

Gennes v. Yellow Book of N.Y., Inc.,
806 N.Y.S.2d 646 (App. Div. 2d Dep't 2006)................................................22, 23

Gold v. New York Life Ins. Co.,
No. 09-3210, 2011 WL 2421281 (S.D.N.Y. May 19, 2011) ....................2, 5, 11, 24

In re Angello v. Labor Ready, Inc.,
859 N.E.2d 919 (N.Y. 2006)................................................................................22, 23

Nabisco v. Warner-Lambert Co.,
32 F. Supp. 2d 690 (S.D.N.Y. 1999), aff'd, 220 F.3d 43 (2d Cir. 2000)................14

Pachter v. Bernard Hodes Group, Inc.,
891 N.E.2d 279 (N.Y. 2008)........................................................................... passim

Pachter v. Bernard Hodes Grp.,
541 F.3d 461 (2d Cir. 2008)....................................................................................9

Salahuddin v. Goord,
    467 F.3d 263 (2d Cir. 2006).............................................................................3

Williams v. Smith,
    781 F.2d 319 (2d Cir. 1986).............................................................................3

**STATUTES**

26 U.S.C. §§ 3401(a) and 3402(a) ..................................................................25

New York Insurance Law § 4228 ............................................................. passim

New York Labor Law § 193 ..................................................................... passim

**OTHER AUTHORITIES**

26 C.F.R. §§ 1.401(k)-1(a)(4)(iii) and 31.3402(a)-1(b)..................................25

26 C.F.R. § 1.6041-2........................................................................................25

Restatement (Second) of Contracts § 203(a) ..................................................16

iv

## I.    PRELIMINARY STATEMENT

Plaintiffs' motion reflects a tortured reading of contractual provisions in isolation from other terms, conditions and related agreements and their own admitted acquiescence in their compensation system – all the while effectively rewriting the controlling authority embodied in Pachter v. Bernard Hodes Group, Inc., 891 N.E.2d 279 (N.Y. 2008).   Simply put, Plaintiffs present no justification for disturbing this Court's prior rulings or decades of insurance industry compensation practices.  Plaintiffs invoke the same arguments they advanced in opposition to New York Life's summary judgment motions – where they advocated, and the Court found, "genuine factual disputes" precluded summary judgment.  Plaintiffs conveniently ignore the import of this Court's prior rulings, their own testimony, their undisputed acquiescence in New York Life's ledger-based compensation system and the fact that they have already admitted that the vast majority of commission credits posted to their ledgers were unearned.  In short, Plaintiffs fail to carry their burden of proving that New York Life violated NYLL §193.  If anything, Plaintiffs' submission establishes that the Court should grant summary judgment in New York Life's favor.

Plaintiffs' contract interpretation – minted in the confines of their lawyers' offices and not the real world circumstances that formed the relationship between New York Life and Plaintiffs – depends upon (1) out-of-context snippets from their New York Life Agent's Contracts and TAS Agreements – two of the several agreements that formed the basis of their compensation arrangements with New York Life, (2) a myopic focus on the alleged "earned" status of individual ledger credits rather than their overall compensation arrangements, (3) ignoring germane expense agreements, and (4) ignoring Plaintiffs' own acceptance and acquiescence in the ledger-based compensation.  There are glaring flaws in Plaintiffs' argument, not the least of which is that this Court already has held that Plaintiffs' compensation

arrangements were formed through "a patchwork of written agreements" working in concert through New York Life's ledger system and the parties' course of dealings – not just by the Agent's Contract and TAS Agreement.  Viewed as a whole, the record reflects that Plaintiffs received compensation determined by the rolling posting and reconciliation of positive and negative entries on their ledgers.[1]  NYLL §193, as interpreted in <u>Pachter</u>, sanctions this system.

To prop up their argument, Plaintiffs conflate two distinct terms.  Specifically, Plaintiffs treat "commissions" as meaning the same thing as "compensation" even though the parties' agreements and course of conduct establish that those terms are not one and the same.  And while Plaintiffs suggest there is something unlawful about ascribing different meanings to those terms, <u>Pachter</u> holds in no uncertain terms that it is perfectly lawful under Section 193 to adjust commission credits against expense debits to determine wage payments.  <u>Pachter</u> is indistinguishable from these cases in any meaningful way – a fact that precludes judgment in Plaintiffs' favor, compels the denial of Plaintiffs' joint motion for partial summary judgment and, indeed, if anything, compels entry of summary judgment for New York Life.

## II.    COUNTERSTATEMENT OF FACTS

New York Life incorporates its Rule 56.1 Counterstatement, its response to Plaintiffs' Rule 56.1 Statement, its Rule 56.1 Statements submitted with its summary judgment motion in <u>Chenensky</u> (Chenensky Dkt. # 30) and <u>Gold</u> (Dkt. # 27), and the Court's prior decisions on those motions and New York Life's motion to strike Chenensky's class allegations.

---

[1]    Plaintiffs exclude Gold's commission reversal claim (and Chenensky's proposed reversal claim) from their motion for partial summary judgment because the theories they espouse on those claims conflict with their contention that commission credits were "earned" prior to the rolling application of debits. On the reversal claim, Plaintiffs contend that only commissions associated with premiums received and kept by the company were "earned" and not subject to reversal.  They concede that advanced and annualized commissions were not earned when posted or paid through the ledger process.  That contradicts from their argument that the commission credits on their ledger were actually earned wages under NYLL §193 before debits were applied to determine their compensation.

### III.   ARGUMENT

#### A.   Legal Standard For Motion For Summary Judgment.

Summary judgment may be granted only if the moving parties can demonstrate that "there is no genuine dispute as to any material fact…" and they are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>accord</u> <u>Beckles v. Bennett</u>, No. 05-2000, 2008 WL 821827, at *9 (S.D.N.Y. Mar. 26, 2008).  "[T]he trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Rather, the Court's role is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Id.</u> at 251-52; <u>see also</u> <u>Beckles</u>, 2008 WL 821827, at *10.  "All ambiguities must be resolved and all inferences drawn in favor of the party against whom judgment is sought."  <u>Williams v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986) (citation omitted).

Plaintiffs bear the burden of showing that this threshold requirement has been met. <u>Salahuddin v. Goord</u>, 467 F.3d 263, 272 (2d Cir. 2006); <u>Williams</u>, 781 F.2d at 323 ("[I]f the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.") (internal citation omitted).  Even if Plaintiffs were able to meet the threshold requirement, however, their motion still must fail if New York Life presents evidence that the claimed factual dispute requires a jury to resolve the parties' different positions.  <u>Anderson</u>, 477 U.S. at 249.

#### B.   This Court's Prior Decisions Compel Denial Of Plaintiffs' Motion.

While New York Life respectfully disagrees with the Court's partial denials of summary judgment in its favor in both cases, the Court has held three times now that there are disputed issues of fact regarding the agreements and understandings of the parties.  More specifically, in

denying summary judgment in <u>Chenensky</u>, this Court held:

> Several related agreements between New York Life and Chenensky address the credits and debits to Chenensky's ledger. However, considered together, the documents do not disclose a definite meaning concerning the timing of debits relative to credits.
>
> The Agent's Contract yields no clear answer. Section 18 states that "New York Life shall pay to the Agent . . . commissions on premiums received by New York Life under [policies] issued as a result of applications obtained by the Agent while the Agent's Contracts is in force." Although Section 18 discusses the payment of commissions, it does not illumine the point in time when the commissions are earned. Section 9 concerns debiting and states that "New York Life is hereby given a paramount and prior lien upon all compensation payable . . . as security for the payment of any claim or indebtedness or reimbursement whatsoever due . . . to New York Life from the Agent." By placing a lien on compensation that is payable, New York Life appears to be debiting monies already earned.
>
> Moreover, the language in the TAS Agreement addendum does not dispel the uncertainty. Sections 7 and 9 of the addendum state, *inter alia*, that an agent's ledger could be debited if a policyholder's premium was refunded or if a policyholder misrepresented material facts in his application. While these sections may buttress New York Life's argument that the commission was not earned at the time a ready and willing buyer was located, they do not address the actual timing of debits for insurance, phone, and other expenses.
>
> Finally, the language of the side agreements allowing debits for office expenses is inconsistent . . . .
>
> *      *      *
>
> Because none of the documents address the earning of credits and the timing of deductions in a comprehensive way, Chenensky's contract is ambiguous. Such a factual issue cannot be resolved on summary judgment. Perhaps recognizing this, the parties submitted significant conflicting extrinsic evidence on the parties' course of dealings. That contradictory evidence cannot be reconciled at this stage. Accordingly, New York Life's motion for summary judgment with respect to Chenensky's New York Labor Law § 193 claim is denied.

<u>Chenensky v. New York Life Ins. Co.</u>, No. 07-11504, 2009 WL 4975237, at *8-9 (S.D.N.Y. Dec. 22, 2009).

Relying on that opinion in <u>Chenensky</u>, Plaintiff Gold later argued in opposition to New York Life's summary judgment motion: "With respect to compensation, Plaintiff Gold relies on essentially the same facts as Plaintiff Chenensky, for whom **it is the law of the case** that genuine factual disputes preclude summary judgment against his § 193 claims." Gold Opp. to SJ Br., at p. 8 (Dkt. # 33) (emphasis added).

In the same vein, this Court denied summary judgment in <u>Gold</u>, holding:

> In <u>Chenensky</u>, this Court held that the patchwork of written agreements between New York Life and its agents was ambiguous on this point. <u>Chenensky</u>, 2009 WL 4975237, at *8-9.  [B]ecause the contracts in this action are substantially the same as those in <u>Chenensky</u>, this Court concludes they are ambiguous.  [Citing Agent Agreement 9, 15; TAS Agreement ¶¶7, 9; Registered Representative Agreement ¶ 5; Telephone and Equipment Service Agreement; and Rental Agreement.]

<u>Gold v. New York Life Ins. Co.</u>, No. 09-3210, 2011 WL 2421281, at *6-7 (S.D.N.Y. May 19, 2011).

Likewise, on Defendants' motion to strike Chenensky's class allegations, this Court held:

> In its prior Memorandum and Order, this Court ruled that the employment agreement between New York Life and Chenensky was ambiguous as to when commissions became earned. <u>Chenensky</u>, 2009 WL 4975237, at *8-9.
>
> *          *          *
>
> The interpretation of ambiguous contract language is a question of fact.  And "[t]here is no surer way to find out the intent of the parties to a contract than to see what they have done." Thus, "[i]n determining the meaning of the language at issue, the jury may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract." Some of this evidence will be of company-wide practices and policies, which will be common to all potential class members. But much of this evidence must necessarily come in the form of individualized determinations of the individual class members' knowledge and understanding of their employment contracts with New York Life, as demonstrated through their individual conduct.
>
> The existence of an implied contract is also a question of fact. As with the interpretation of an ambiguous agreement, a "contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct."

<u>Chenensky v. New York Life Ins. Co.</u>,  No. 07-11504, 2011 WL 1795305, at *2-3 (S.D.N.Y. Apr. 27, 2011) (citations omitted).

Ignoring the Court's prior rulings, Plaintiffs argue that the Agent's Contract and TAS Agreement – to the exclusion of the rest of, as the Court referred to them, the "patchwork" of compensation agreements – establish that New York Life violated NYLL §193.  Plaintiffs cannot escape, however, that this Court already has held that those agreements were ambiguous.

Moreover, a Court may not grant summary judgment based upon an ambiguous agreement unless (i) the evidence presented about the parties' intended meaning is so one-sided

5

that no reasonable person could decide the contrary, or (ii) the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.  See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153 (2d Cir. 2000); 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 746-47 (2d Cir. 1999).  Plaintiffs fail to establish either exception to this rule.

This Court already has held that the interpretation of the parties' agreements is a question of fact requiring an examination of "the parties' course of conduct throughout the life of the contract."  Chenensky, 2011 WL 1795305, at *3.  The Court also held that the record is replete with "significant conflicting . . . evidence on the parties course of dealings" that cannot be resolved at summary judgment.  Chenensky, 2009 WL 4975237, at *9.  Those holdings establish that New York Life has presented substantial extrinsic evidence supporting its interpretation of the parties' agreements and that the evidence concerning Plaintiffs' intended meaning is not one-sided.  The existing record, coupled with the fact that the Court must view the evidence in the light most favorable to New York Life precludes entry of summary judgment for Plaintiffs.

### C.    Plaintiffs Misinterpret And Fail To Distinguish Pachter.

Contrary to Plaintiffs' assertion, Pachter did not create an affirmative defense or an "exception" to NYLL §193.[2]  Rather, Pachter recognizes the distinct nature of commissioned-based compensation and holds that parties can agree, in writing and/or through their course of dealings, that an employee's pay will be determined by a simple equation of applying all agreed negative adjustments against all agreed commission or other credits and paying the balance.

Plaintiffs also misconstrue Pachter insofar as they argue that New York Life's perceived inability to pinpoint generically the exact moment when an agent earns *commissions* on a wide-

---

[2]    Nowhere in Pachter does the Court of Appeals use the terms "exception" or "affirmative defense."  Plaintiffs' counsel has created those terms from whole cloth.

variety of products subject to a multitude of circumstances provides a basis for judgment in their favor. Under Pachter, the time when individual *commissions* are eligible to be credited to an agent's ledger, paid to an agent or become irreversible is inapposite. What matters is whether the parties' course of conduct evidences an agreement that Plaintiffs' *compensation* would be the net of the credits and debits. Here, it clearly does.

Likewise, Plaintiffs attempt to read into Pachter a mandate that an employer establish and communicate a specific moment in time that compensation is deemed earned in all circumstances, and after which no downward adjustments to calculate earnings may be made. Where does Pachter say that? Notably, Plaintiffs offer no pinpoint cite to support their argument. That is because Pachter neither expressly nor impliedly imposes any such requirement. There was no written agreement whatsoever in Pachter, and Pachter's employer never pointed out the "precise timing of the earnings computations" or provided any greater detail concerning a specific earnings computation formula than did New York Life here. In fact, rather than presenting a precise formula or computation, Pachter's monthly statements simply set forth her current month commission credits, the debits applied by the company, Pachter's draw and the closing balance. See Pachter Appellant's Brief, Pachter v. Hodes Grp., Inc., No. 2008-86, 2008 WL 2245782 (N.Y. Jan. 14, 2008); Pachter's Commission Statement, Ex. 22 to Mayes Decl. Plaintiffs do not and cannot explain how that differs in any meaningful way from the circumstances herein presented.

Similarly, Plaintiffs' contention that Pachter requires proof that ledger debits were part of the "computation of commission" finds no support in Pachter. To the contrary, Pachter permitted the employer to determine compensation by totaling the individual commissions generated from sales and deducting "charges" for various expenses. Pachter, 891 N.E.2d at 281

n.1.  The Pachter Court used the term "commission earnings" to refer to the net amount paid to

Pachter after expenses were debited – i.e., her compensation – describing "commission earnings"

as follows:

> Pachter's commission earnings were calculated using a formula. When a client of
> Hodes agreed to a media buy, Hodes would advance payment to the media company
> and the client would subsequently reimburse Hodes and pay a fee for Pachter's
> services.  When the client was billed, Pachter received a percentage of the amount
> billed minus particular charges that are central to the dispute in this case -- client
> receipts were reduced by certain business costs, such as finance charges for late
> payments, losses attributable to errors in placing advertisements, uncollectible debts
> and Pachter's travel and entertainment expenses. In addition, she chose to work with an
> assistant, and half of the assistant's salary was deducted from Pachter's percentage of
> billings.  Each month, Pachter received a commission statement that listed her total
> billings and the percentage of those billings that represented her gross commission. The
> expenses attributed to her activities and any advances she had drawn from her
> commission account were then deducted to reach the net amount of income she had
> earned for that period. Pachter concedes that she was aware of the charges Hodes
> subtracted from her gross commissions and acquiesced in the compensation scheme for
> over a decade.

Pachter, 891 N.E.2d at 281 (footnote omitted).

      This passage confirms that the Pachter Court was not concerned with the earned status of

individual commission credits at all.  In that description, the Court of Appeals acknowledged that

even though Pachter completed the conditions precedent to "earn" (meaning "generate") the

individual commissions from her sales, she and her employer understood that the company

would pool the various commissions generated by Pachter over the course of each month and

then deduct various expenses and advances from her ledger statement before arriving at

Pachter's "commission earnings."  Thus, Pachter confirms that the point at which individual

commission credits are payable to an agent's ledger or disbursed to the agent is of no moment.

      The passage above also confirms that (i) the net figures on Pachter's monthly statements

(as here) included advanced and unadvanced commission credits as well as debits for

miscellaneous general expenses; (ii) Pachter's employer reversed advanced commissions when

the company could not collect the balance owed by the customer (e.g. "bad debt"); and (iii) the company debited those reversal amounts from credits on Pachter's future statements.  The Court endorsed such commission reversals because the parties' course of dealings and the monthly compensation statements established that Pachter's earned compensation was the net of all credits and debits, even without any written agreement.  See Pachter, 891 N.E.2d at 281, 284-85; Pachter v. Bernard Hodes Grp., 541 F.3d 461 (2d Cir. 2008):

> Pachter's cause of action must fail, however, because it is undisputed that Pachter knowingly acquiesced over a period of years to the approach used by Hodes when calculating her commissions, conduct that constituted, at the very least, an implied agreement between the parties.  As this implied agreement does not violate 'section 193 nor any other provision of article 6 of the Labor Law,' the deductions in question did not violate that provision.

### 1. Plaintiffs Conflate The Concepts Of Commissions And Compensation.

Plaintiffs conflate the terms "commissions" and "compensation" throughout their brief.[3] The distinction is important and, with all respect, is one that the Court has not addressed when previously denying New York Life's summary judgment motions.  Section 193 addresses deductions from earned wages.  Under Pachter, the parties to a commission-based compensation system can agree – either in writing or through their course of conduct or both – that the employee's compensation (i.e. earned wages) equals commissions minus expenses.  They can agree that culminating a sale that produces a commission is not the point when an employee's compensation is earned.  Consistent with Pachter, New York Life and Plaintiffs agreed that,

---

[3]  Plaintiffs attempt to justify their indiscriminate use of those terms by suggesting that Robert Hynes testified that the words were synonymous.  He did not.  Mr. Hynes testified only that, in the context of certain sections of New York Life's "The Opportunities Program" Manual, the author appeared to use the terms compensation and credits synonymously.  He further testified that the main purpose of the "The Opportunities Program" Manual was to provide a general understanding of how the credits applied to the agent's ledger would be calculated, not how expense debits were determined or how agents are compensated in general and that agent compensation is determined through the netting of credits and debits on the agent's ledger on a rolling basis.  See Hynes dep. 68:19-69:22; 228:19-229:6, Exh. A to Lynch Decl.  He did not testify that ledger credits are generally synonymous with agent compensation.

notwithstanding the complex commission rates and rules governing the calculation of individual product commissions, Plaintiffs' compensation would be determined through the ledger-based reconciliation system.  Similar to maintaining a bank account, New York Life deposited credits generated from Plaintiffs sales and applied debits authorized by Plaintiffs.  Plaintiffs freely and regularly withdrew the balance from the ledger (with the option to keep a running balance).  See Hynes Dep. 211:6-212:12, Exh. A to Lynch Decl.

Plaintiffs acknowledged, upon joining New York Life, that this is how New York Life would pay them.  Plaintiffs' TAS Agreements specifically provide:

> A ledger account, herein referred to as the Agent's ledger, will be established for the Agent.  Appropriate credits and debits will be entered on the Agent's ledger in accordance with this Agreement and the Company's rules and procedures concerning the administration of the Agent's ledger.  For purposes of this Agreement, commissions are credited to an Agent's ledger only after the required premiums have been received and applied at the Company's Home Office.

TAS Agreement, §9(b), Ex. 2 to Mayes Decl.  In Plaintiffs' zeal to rewrite the "patchwork of agreements," they inexplicably ignore this provision (and the 48 other TAS Agreement references to items being credited to or debited from their ledgers) – which is the foundation of the compensation system upon which New York Life paid each Plaintiff every penny to which they ever were entitled.

Plaintiffs also gloss over the multiple agreements that each signed authorizing debits.  Read as a whole – and not just the parts that Plaintiffs self-servingly select – Plaintiffs' "patchwork of agreements" confirm that their compensation was the product of credits minus debits reconciled on their ledgers.  New York Life paid Plaintiffs through the ledger system during the entirety of their tenures.  Neither Plaintiff ever suggested that he had received less than that which he understood himself to be contractually entitled.  Thus, the language of the TAS Agreement and the undisputed evidence concerning the parties' course of dealings, shows

that ledger credits <u>and</u> debits were both agreed-upon components of Plaintiffs' compensation.

This ignored distinction between "commissions" and "compensation" explains the colloquy with the Court regarding the issue of when commissions are "earned" that Plaintiffs suggest somehow distinguishes these cases from <u>Pachter</u>.[4]  Under <u>Pachter</u> and the circumstances of this case, the point at which New York Life credited commissions to Plaintiffs' ledger or paid them their ledger balances is not determinative of when a Plaintiff earned compensation, especially since insurance laws preclude insurance companies from treating credited or paid commissions as "earned" (in the sense that they can no longer be reversed) simply because they were credited or paid or because the company received a premium payment.  The proper inquiry under Section 193 is when did the parties understand that the Plaintiffs' *compensation* would be considered earned?  <u>Pachter</u> confirms that a commission-based compensation system is not illegal simply because the employer will apply debits to commission credits to determine compensation or because there is a possibility that a commission credit might be reversed in the future and show up later as a debit on the ledger.[5]  Compensation and commissions are two very

---

[4]   Plaintiffs mischaracterize the colloquy to argue that New York Life contends that no wages were ever earned.  <u>See</u> Pls' Br. p. 2, fn 2.  New York Life has never taken that position.  To the extent that there may be a fact dispute regarding when New York Life considered Plaintiffs' commission-based compensation earned, that does not mean Plaintiffs earned no wages.  New York Life's consistent position, which is in line with decades of industry practice – is that Plaintiffs earned compensation through the ledger process and individual commission credits become irreversible when all conditions are satisfied, premiums are paid and possible rescission events could no longer occur.  The fact of the matter is that the Court's question does not have a singular answer as when a particular commission credit becomes irreversible because that answer is a function of the rules attendant to the particular type of product sold, which rules differ based on product.

[5]   On this point, it bears noting that Court's expressed concern regarding the potential draconian result of a commission being reversed years after a policy is purchased (<u>Gold v. New York Life Ins. Co.</u>, No. 09-3210, 2011 WL 2421281, at *7 (S.D.N.Y. May 19, 2011)) occurs  very rarely and, more importantly, never happened to Plaintiffs.

different issues that seem to continue to confound Plaintiffs' counsel[6] – but which should not be lost on this Court.

Pachter unequivocally bears out this point.  As noted above, the Pachter Court used the term "commission earnings" to refer to the net amount paid to Pachter after expenses were debited – i.e., her compensation.  In describing how Pachter's commission earnings were calculated, the Court of Appeals acknowledged that even though Pachter completed the conditions precedent to "earn" (meaning "generate") the individual commissions from her sales, she and her employer understood that the company would pool those commissions monthly and then deduct various expenses and advances from her ledger statement before arriving at Pachter's "commission earnings."  Thus, Pachter confirms that the point at which individual commissions are creditable to a ledger or even disbursed is of no consequence.

### 2.  Plaintiffs' Attempt To Distinguish Pachter Is Baseless.

Despite Plaintiffs' effort to obscure the similarities of their compensation agreements and understandings with New York Life to that at issue in Pachter, they are materially identical.   The following chart summarizes the striking similarities between these cases and Pachter:

| Pachter's Compensation | Plaintiffs' Compensation |
|---|---|
| • Hodes credited Pachter with advanced and unadvanced commissions generated from her sales.  Pachter, 10 N.Y.3d at 613. | • New York Life credited Plaintiffs with advanced and unadvanced commissions generated from their sales (in addition to allowance payments).  Defs. 56.1 Ctrstmt. ¶¶ 10-19. |
| • Hodes applied debits to Pachter's monthly compensation statements for business expenses such as travel and entertainment expenses, marketing expenses, miscellaneous expenses related to her work which the company advanced and Pachter was required to repay, finance charges for late payments by her clients, and chargebacks for her client's nonpayment and | • New York Life applied debits to Plaintiffs' ledger on a rolling basis for expenses authorized by Plaintiffs in writing, including rent, professional liability insurance, telephone charges and technology expenses.  Id., ¶¶ 2, 26-29. |

---

[6]   It is apparent that Plaintiffs themselves understood the difference between "commissions" and "compensation", as evidenced by their signed agreements, years of acquiescence and testimonial admissions that they had received all to which they were entitled.  Thus, it is only their counsel who is confounded.

12

| | |
|---|---|
| "bad debt."  Id. at 613. | |
| • Hodes reversed previously advanced commissions from later compensation statements where the customer failed to pay the company. Id. at 613. | • New York Life debited previously advanced commissions on a rolling basis upon the customer's failure to pay the corresponding premium, policy rescission, etc. Id., ¶¶ 15-19. |
| • Hodes did not match particular debits with particular credits on monthly compensation statements.  Id. at 613. | • New York Life did not match particular debits with particular credits on Plaintiffs' ledgers. Id., ¶ 8. |
| • Each month, Pachter received a compensation statement showing credits and debits applied to determine her overall compensation.  Id. at 618. | • Plaintiffs had continual online access to view credits and debits applied to their ledger and received bi-weekly ledger statements showing credits and debits applied to determine their overall compensation. Id., ¶ 3. |
| • Pachter acquiesced in the compensation system for years without complaint. Id. at 618. | • Plaintiffs acquiesced in the compensation system for years without complaint. Id., ¶ 9. |

In the face of these similarities, Plaintiffs illogically argue that Pachter is inapposite because, unlike Pachter, there are written agreements in this case.  Pls' Br. at p. 3.  The irrationality of this point cannot be overstated.  Plaintiffs signed TAS Agreements that unmistakably refer to a ledger-based compensation system and additional agreements that expressly authorized New York Life to debit their ledgers for the expenses.  The employer in Pachter could cite no such writings that spelled out the understanding of the parties – it relied strictly on its practices and Pachter's acquiescence.  Yet, Pachter held that was good enough.  It defies reason, logic and common sense to suggest that the principles behind Pachter do not apply here because New York Life reduced the parties' understanding to writings that would avoid later dispute.  If the Court were to accept that argument, the lesson would be clear to employers in New York – write down nothing!  If anything, this case – where Plaintiffs admittedly acknowledged in multiple writings that New York Life had the right to debit certain expenses and would use a ledger-based reconciliation system to determine a periodic disbursement of compensation – presents an even more compelling case for compliance with NYLL §193 than did the facts in Pachter.  It certainly would be ironic if Pachter, who was not bound by any writing, failed to state a claim under NYLL §193, but Plaintiffs here – who expressly and

13

contractually agreed in writing to New York Life's right to compensate them through a reconciliation system – somehow would have a claim.

Given that <u>Pachter</u> is on all fours with these cases, if summary judgment should enter, it should be for New York Life.  <u>See</u> <u>e.g.</u> <u>Nabisco v. Warner-Lambert Co.</u>, 32 F. Supp. 2d 690, 694 (S.D.N.Y. 1999) ("Because the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law."), <u>aff'd</u>, 220 F.3d 43 (2d Cir. 2000) (citations omitted).

### 3. Plaintiffs' Testimony And The Parties' Course Of Dealings Establish That Plaintiffs Fully Understood That Their Compensation Would Be Determined Through The Ledger Reconciliation Process And That New York Life Paid Them In Accord With Their Understanding.

The Court already has ruled that it must evaluate the parties' course of conduct to determine when compensation is considered earned.  Specifically, the Court held:

> "[T]here is no surer way to find out the intent of the parties to a contract than to see what they have done." Thus, "[i]n determining the meaning of the language at issue, the jury may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract." Some of this evidence will be of company-wide practices and policies, which will be common to all potential class members. But much of this evidence must necessarily come in the form of individualized determinations of the individual class members' knowledge and understanding of their employment contracts with New York Life, as demonstrated through their individual conduct.

<u>See</u> <u>Chenensky</u>, 2011 WL 1795305, at *3 (citations omitted).

Consistent with that holding and <u>Pachter</u>, Plaintiffs' admissions and evidence of the parties' course of dealings are determinative of whether a Section 193 violation has occurred.  <u>See</u> <u>Pachter</u>, 891 N.E.2d 285.  Plaintiffs submit a 97-paragraph statement of facts full of painstaking parsing of selected portions of cherry-picked writings.  But tellingly absent from Plaintiffs' brief and Rule 56.1 statement are any references to Plaintiffs' testimony or the parties' course of dealings.  Why would Plaintiffs wholly ignore their own conduct and sworn testimony?

The answer could not be more clear.  The actual record – as opposed to the analysis developed in the laboratory setting of Plaintiffs' counsel office – demonstrates that Plaintiffs' actual conduct and testimony clearly contravene their lawyers' argument.  More specifically, Plaintiffs admit that (i) they *understood* and agreed that their compensation at New York Life would be the net of the credits and debits applied to their ledgers; (ii) they *understood* that the annualized commissions posted to their ledgers were not earned; (iii) New York Life paid them through the ledger system as per that understanding (without objection) throughout their affiliations with the Company; (iv) twice per month (or whenever Plaintiffs requested), New York Life provided Plaintiffs with ledger statements and disbursed the net of the pending credits and debits through the ledger system; and (v) they received every penny that they were promised.  [Gold Rsp. to 56.1 Stmt., ¶¶ 106-113, 118-121] (Dkt. # 32); Chenensky Rsp. to 56.1 Stmt., ¶¶ 104-130 (Dkt. # 34).  Those admissions, not the post-hoc arguments contrived by their counsel, are determinative.  See Elliott Co. v. Liberty Mut. Ins. Co., No. 05-1387, 2007 WL 987318, at *3 (N.D. Ohio Apr. 2, 2007) (observing that the intent of the parties to a contract cannot be determined based upon "the arguments of the parties' lawyers years after the contract was signed.").

In addition, Plaintiffs have conceded – but now ignore – that they understood that:

- New York Life's posting of credits to their ledgers did not mean that such amounts were "earned."  [Gold Rsp. to 56.1 Stmt., ¶ 106] (Dkt. # 32), Chenensky Rsp. to 56.1 Stmt., ¶¶ 104-110 (Dkt. # 34)].

- New York Life posted commission credits to Plaintiffs' ledgers on an annualized basis, meaning that when they sold a policy and the customer paid the first month's or first quarter's premium, New York Life advanced the full First Year Commission ("FYC") to their ledgers even though the Company had not yet received the full first-year premiums.  [Gold Rsp. to 56.1 Stmt., ¶¶ 101-106 (Dkt. # 32), Chenensky Rsp. to 56.1 Stmt., ¶¶ 104 (Dkt. # 34)].

- Part of their agreement with New York Life was that if the policy did not "hold up," the commissions would be reversed off the ledger.  [Gold Rsp. to 56.1 Stmt., ¶ 106 (Dkt. # 32); Chenensky Rsp. to 56.1 Stmt., ¶¶ 105-110 (Dkt. # 34).

- New York Life would reverse credits associated with the uncollected portion of the annualized commission (i.e., if the customer canceled the policy or allowed the policy to lapse before paying all premiums). [Gold Rsp. to 56.1 Stmt., ¶¶ 102-106 (Dkt. # 32), Chenensky Rsp. to 56.1 Stmt., ¶¶ 105-110 (Dkt. # 34)].

- In addition to non-payment of premiums associated with advanced FYCs, there were other reasons why credits to Plaintiffs' ledgers remained subject to reversal (i.e. failure to submit a policy delivery receipt or policy rescission). [Gold Rsp. to 56.1 Stmt., ¶¶ 104-105 (Dkt. # 32); Chenensky Rsp. to 56.1 Stmt., ¶¶ 105-110 (Dkt. # 34)].

Those admissions and the parties' course of dealings bar summary judgment in Plaintiffs' favor. Having agreed to and worked under the ledger compensation system, Plaintiffs cannot now rewrite it to eliminate the debits while keeping all of the credits that factored into their pay.

### D.   Plaintiffs' Argument Contravenes New York Insurance Law § 4228 And Decades Of Industry Practice.

It is well-settled that ambiguous contracts should be interpreted in a manner consistent with industry custom and in a manner that gives a reasonable, underline_lawful, and effective meaning to all the terms.  See e.g. Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); Atateks Foreign Trade Ltd. v. Private Label Sourcing, LLC, No. 07-6665, 2009 WL 1803458, at *4 (S.D.N.Y. June 23, 2009), aff'd, 402 F. App'x 623 (2d Cir. 2010) (evidence of the parties' course of dealing as well as industry custom and trade usage may be considered by the Court to assist in its interpretation of an ambiguous contract).  Here, Plaintiffs' interpretation of the agreements in this case is both contrary to industry custom and applicable law.

As an initial matter, Pachter and this Court's prior decisions make passing reference to the common law rule from the real estate industry that commissions may be earned upon the procurement of a ready, willing and able buyer.  The parties agree that this rule does not and cannot apply in the context of insurance sales.  The rules and regulations governing the insurance industry – including New York Insurance Law § 4228 – prohibit a finding that an agent "earns"

16

commissions simply by procuring someone interested in purchasing a policy.

Section 4228 regulates the expenses of insurance companies licensed to do business in New York.  N.Y. Ins. Law § 4228(a).  It contains detailed rules and limitations regarding the amounts that a life insurer may "pay or permit to be paid" to agents in connection with the sale of individual life insurance and annuity products.  N.Y. Ins. Law § 4228(d)(5); Def. 56.1 Ctrstmt., ¶ 31.  To avoid violating Section 4228's commission caps, insurance companies must treat first year commissions generated by agents as subject to reversal even after premium receipt.  Put differently, if New York Life treated commissions as "earned" (meaning not subject to reversal) at the time it posted the commission credit to the ledger or when the first premium is received, it would violate Section 4228 each time a policy lapsed in its first year or New York Life rescinded a policy because New York Life would be unable to reverse the commissions that were overpaid to the agent.[7]  Consistent with New York Life's legal obligation to reverse commission credits associated with unpaid, rescinded or cancelled policies, Gold withdrew his advanced and annualized commission reversal claim.   <u>See</u> Stipulation, Exh. M to Lynch Decl.

Plaintiffs' position in this case is irreconcilable with Insurance Law § 4228 because failing to reverse commission credits in the event of a rescission, policy cancellation, etc. would result in paying an agent more than the statutory commission cap.  While Plaintiffs' counsel apparently does not accept the impact of § 4228, this Court cannot ignore its bearing on the agreement of the parties.  Plaintiffs operated as insurance agents in a highly regulated industry.  The common understanding within the industry (which bears upon the <u>Pachter</u> analysis) is that

---

[7]  By way of example, if the full first year's premium for a whole life policy were $1,200, New York Life would credit an agent with $660 (55%) in annualized commissions after receipt of the first month's premium ($100).  If the customer fails to make any further payments or cancels the policy, the agent will have been paid $660 despite that New York Life collected only $100 in premiums.  The agent would have received 660% of the premiums received – far more than the limit imposed by NYLL §4228.

commissions credited and, in many instances, paid to agents are not actually earned at the time of crediting or payment.[8]  Adopting Plaintiffs' argument would turn the compensation systems of many insurance companies on their heads because it would be tantamount to saying that commission credits are not subject to reversal upon premium receipt, which is not how the insurance industry operates.[9]  Given that the Court must interpret the agreement of the parties in a manner consistent with applicable law, Plaintiffs' claims must fail and, indeed, summary judgment should be entered in favor of New York Life.

> **E.  Plaintiffs' Tortured Parsing Of Selected Portions Of Some – But Not All – Relevant Agreements Does Not Come Close To Carrying Their Burden Of Proving That They Must Prevail As A Matter Of Law On Their Claim That New York Life Deducted Amounts From Earned Wages.**
>
> > **1.  The Agreements And Extrinsic Evidence Do Not Establish That New York Life Deducted Amounts From Plaintiffs' Earned Wages.**
> >
> > > **a.  "Payable" commissions and "Allowed" training allowances do not equate to earned compensation.**

Plaintiffs cite out-of-context snippets from their TAS Agreements and Agent's Contract – both of which have been reviewed previously by this Court – to argue that New York Life stated

---

[8]  As evidence of the aberrant nature of Plaintiffs' position and the understanding common in the insurance industry and at New York Life, New York Life submits declarations from New York Life agents describing how their understanding of the New York Life ledger-based compensation system is consistent with New York Life's interpretation of the parties' agreements in this case.  See e.g. Declarations of Amanda Marino and Kevin Martin, Exhs. J and K to Lynch Decl.

[9]  Although Section 4228 generally limits first year commissions on individual life policies, it also regulates other forms of compensation paid to agents.  It permits companies to adopt Expense Allowance Plans ("EAPs") that provide subsidies to support agents paying their sales expenses.  N.Y. Ins. Law § 4228(b)(11).  EAP payments to agents can, and often do, exceed the agent's actual selling expenses.  If a company adopts an EAP, its agents are eligible to receive in combined expense allowance and first year commissions, depending upon established sales thresholds, up to 91% of first year premiums on annual sales of individual life insurance products.  N.Y. Ins. Law § 4228(d)(5)(a); Def. 56.1 Cntrstmt., ¶125.  To ensure stay within that limit, the company must take into account not only cash amounts paid to agents in connection with the sale of individual life insurance and annuity products, but also "goods and services" that the company provides to its agents without a charge or at a subsidized charge.  Id.; Def. 56.1 Cntrstmt., ¶ 126.  Thus, if New York Life was obligated to retroactively reimburse agents for the authorized expense debits as Plaintiffs seek, it would, for some agents receiving EAP payments, run afoul of Section 4228 because the combination of commissions, EAP payments and expense reimbursement would exceed 4228's statutory maximums.

that commissions, TAS Allowance and Expense Allowance payments would be "payable" or "allowed" upon the occurrence of conditions precedent outlined in those agreements and the corresponding commission manuals.  "Payable" commissions or "allowable" supplements, however, do not equate to "earned wages" under NYLL § 193, especially as interpreted by Pachter, which requires a review of the understanding of the parties and an employee's acquiescence.  Indeed, Insurance Law § 4228 effectively precludes treating "payable" as synonymous with "earned."   Indeed, Plaintiffs concede that "payable" commissions include advanced and annualized commissions – which they admit were unearned. See Gold SJ Opp. Br., Dkt. # 33, at p. 31.[10]  As such, even if the word "payable" could be synonymous with earned, it is, at best, a further ambiguity identified by Plaintiffs that would require a finder of fact to discern what each Plaintiff understood it to mean and why did they acquiesce literally for years if they thought "payable" meant "earned."

In fact, there is no ambiguity.  The concepts of commissions being "payable" and training allowances being "allowed" are entirely consistent with posting credits to an agent's ledger and later reconciling them against debits.  Indeed, the TAS Agreement expressly provides that the commissions that Plaintiffs describe as "payable" will be "credited to an Agent's ledger" together with appropriate debits – a point that Plaintiffs conveniently ignore.  See TAS Agreement, ¶9(b), Ex. 2 to Mayes Decl.  In fact, the TAS Agreement includes 46 references to commissions and allowance payments being "credited" to the agent's ledger.  That is how New

---

[10]   What's more, as indicated in the sample ledger statement submitted by Chenensky (Ex. 24 to Mayes Decl.), the vast majority of commissions posted to his ledger were advanced or annualized.  On that statement, FYC entries with the designation "C", "Q" and "M" in the HP column are annualized commissions credited to Chenensky because his customer agreed to pay the corresponding premiums on a "Check-O-Matic", "Quarterly" or "Monthly" basis.  See Commission Manual, Exh. D to Lynch Decl.  Plaintiffs concede that those amounts are not earned such that, even absent an agreement that compensation would be derived through the ledger reconciliation, no debit applied to those amounts could constitute a Section 193 violation.

York Life paid Plaintiffs throughout their time with the Company and it is parallel to Pachter's compensation.[11]

> **b.      That premium receipt is a condition precedent to crediting commissions is immaterial to whether those commission credits are earned under NYLL § 193.**

Plaintiffs' contention that portions of the TAS Agreement suggest that they earned commissions simply because the payment of commissions was subject to conditions precedent "including though not limited to New York Life's receipt of the underlying premium" establishes nothing. See Pls' Br. p. 8. Again, Plaintiffs confuse the distinct issues of (1) when commissions get credited to a ledger with (2) when compensation is earned under Section 193.

Plaintiffs continue to ignore that that payment of premiums is a necessary, but not sufficient, prerequisite to the crediting of commissions and, later, to the credit being irreversible. There is abundant record evidence, including Plaintiffs' own testimony, that there are multiple conditions precedent for receiving commission credits, such as submitting a policy delivery receipt, keeping the business on the books, receiving premiums, etc. Plaintiffs concede their understanding that a policy remains subject to rescission for a variety of reasons, potentially requiring New York Life to refund premiums and, correspondingly, reversing commissions. See Def. 56.1 Cntrstmt., ¶¶ 13-23. Accepting the premise that if New York Life does not receive the policy premiums that the corresponding commissions are subject to reversal, it follows that commissions associated with refunded premiums could not be "earned" even if there were no agreement to reconcile credits and debits to determine compensation. As a result, commission credits cannot be considered "earned" simply because the customer paid the underlying policy

---

[11]   Pachter's employer posted "payable" commission credits to her monthly compensation statement together with debits for various expenses. At the end of the month, the employer reconciled the credits and debits to determine her compensation. Pachter, 891 N.E.2d at 281. If a payable commission credit turned out to be a bad debt in a later month, it then became a debit in that month despite its inclusion in the payable amount in a previous month.

premium.  They could only be deemed earned after all conditions to the underlying policies are fulfilled such that the premiums are non-reversible.  Plaintiffs do not and cannot point to any situation where New York Life debited any expense against any irreversible commission credit.

> **c.      Plaintiffs fail to identify the moment when they believe that individual commission credits were earned – further confirmation that they understood their compensation was the net of credits and debits on any given pay date.**

Plaintiffs struggle to avoid arguing that the point at which New York Life credits something to the ledger is the point at which it is earned because they know that flies in the face of their prior acknowledgment that commissions are <u>not</u> earned until premiums are received. Nonetheless, they baldly assert that they earned ledger credits at some unspecified moment "before ledger reconciliation resulted in earnings reduced by illegal deductions."  Pls' Br. at p. 10.  Plaintiff's argument, which is devoid of record citation or legal authority, also is inherently inconsistent.  If commission credits are not earned when posted, how are they earned prior to the rolling reconciliation of credits and debits on the ledger?  Plaintiffs are silent on this point.

New York Life applied debits to Plaintiffs' ledger on a rolling basis – netting the credits and debits as they were posted to the ledger.  Indeed, it would be impossible to match up specific credits and debits where a commission reversal might occur months after New York Life posted the corresponding credit to a ledger and money had been withdrawn.  For example, if one of Gold's customers paid premiums for three months before stopping, New York Life will have credited the first year commission based on the full year of premium on his ledger in month 1 and paid to him the net of credits and debits applied to his ledger for that month.  The subsequent reversal of nine months of advanced commissions would not be posted as a debit until month 4, at the earliest.  The reversal would be reconciled against the balance of the credits posted to his ledger in month in which it is applied.

2.     **Plaintiffs' Other Recycled Legal Arguments Do Not Provide A Basis For Summary Judgment In Their Favor.**

a.     **Plaintiffs' "Company Store" argument is still flawed and their Section 193 cases are inapposite.**

Plaintiffs' effort to liken their employment to that of employees in a turn-of-the-century "company store" (Pl. Br. at p. 19) finds no support in the NYLL, Pachter or the facts of this case. Plaintiffs, as Gold did before, argue that even though they received everything that New York Life ever agreed to pay them in exchange for their services, Section 193 somehow barred New York Life from taking into account the debit side of their ledgers when determining payable compensation.  Pachter (and this Court in the context of the prior motions) already squarely rejected that argument, and this Court should do so again now.

Plaintiffs' repeated reliance on In re Angello v. Labor Ready, Inc., 859 N.E.2d 919 (N.Y. 2006), remains misplaced.  First, Angello stands for the proposition that Section 193 protects the employee's compensation expectation.  The day laborers in Angello had worked their scheduled shifts for which their employer owed them a pre-determined amount of money for their time worked.  Yet, when they went to collect their pre-determined wages, the employer charged them a fee to process payment, leaving them with less money than their pre-determined (and expected) wages.  Plaintiffs, by contrast, admittedly were paid in full accord with their expectations. See Def. 56.1 Cntrstmt. ¶30.

Second, Angello did not deal with commission-based compensation.  Pachter makes clear that, unlike in the hourly-based wage setting, lawful commission-based systems may include reconciliation of business-related costs as part of determining compensation, whereas offsets cannot be made when calculating time-based wages.  Pachter, 891 N.E.2d at 284.

Third, the Pachter Court cited Angello and the Gennes v. Yellow Book of N.Y., Inc., 806 N.Y.S.2d 646 (App. Div. 2d Dep't 2006) (involving compensation plan that docked employee

22

pay for not obtaining renewals for assigned accounts).  Pachter, 891 N.E.2d at 280, 283.  It nonetheless held that Pachter's compensation was lawful under Section 193.  That holding confirms that neither Angello nor Gennes precludes the compensation system at issue here.[12]

### b. Plaintiffs' TAS allowance and expense recompense arguments are without merit.

Plaintiffs' assertion that debits should only apply to TAS Allowance Payments because New York Life uses the term "net" – in the sense of "Net Eligible First-Year Commissions" – as part of the formula for calculating TAS Allowance eligibility is flat wrong.  First, that argument fundamentally and misleadingly mischaracterizes the testimony of Robert Hynes.  Mr. Hynes testified, in response to a general question concerning whether there were any references to debits in the "The Opportunities Program" Manual, that the word "net" in the term "Net Eligible First Year Commissions" meant that there had to be a gross amount and a deduction.  Mr. Hynes never testified that the word "net" in that context contemplated the debits described in the debit authorization agreements or applied to the Agent's ledger.  Mr. Hynes further testified that the main purpose of the "The Opportunities Program" Manual was to give an agent a general understanding of how New York Life calculates credits applied to the agent's ledger; the Manual does not describe how agents are compensated generally.  See Hynes dep. 68:19-69:22, Exh. A to Lynch Decl.

Second, Plaintiffs' argument ignores that the TAS Agreement states that all credits and debits comprising compensation – including TAS Allowance – will be applied to the agent's ledger.  It does not remotely suggest that debits will be matched up against TAS Allowance payments only – and Plaintiffs certainly present no evidence that that is what they understood.

---

[12]  Likewise, Arbeeney v. Kennedy Executive Search Inc., 893 N.Y.S.2d 39, 43 (App. Div. 1st Dep't 2010), a post-termination commission forfeiture case cited by Plaintiffs is inapposite.  Plaintiffs do not contend that they were denied commissions from their sales.  Indeed, Plaintiffs acknowledge that New York Life paid them everything they were owed.

Third, as used in the TAS Agreement, Net Eligible First-Year Commissions refers to those commission credits generated from products for which New York Life gives credit to agents toward meeting TAS Allowance thresholds.  See TAS Agreement, §7, Ex. 2 to Mayes Decl.  In that context, which Plaintiffs ignore, the use of the word "Net" has nothing to do with expense debits to the ledger.  It signifies that net commissions on first year ordinary life policies, annuity, and individual Long-Term Care Insurance policies count toward TAS Allowance credits.  It also provides that commissions on policies on the life of the agent or any other agent, or on the life of any of their family members (i.e., parent, brother, sister, spouse, or child) shall not count for the purpose of qualifying for Commission-Based Training Allowance and will produce no Training Allowance.  See TAS Allowance Description, Exh. L to Lynch Decl.

Plaintiffs also argue – as they have repeatedly in the past – that when and how New York Life seeks recompense on a debt (e.g., sometimes by separate check, sometimes by collections actions, etc.) provides a basis for judgment in their favor.  That New York Life maintains a procedure whereby it may seek reimbursement from agents for amounts overpaid through the ledger system is neither surprising nor illegal.  First, as explained at p. 24-25 of New York Life's brief in support of its motion for summary judgment in Gold (Dkt. # 25), that procedure is required to comply with the commission limits imposed by N.Y. Ins. Law § 4228.  Second, Plaintiffs admit that New York Life paid unearned, advanced commissions and that those commissions were subject to lawful reversal if the underlying policy premiums were not paid. See Gold SJ Opp. Br. at p. 31 (Dkt. #33).  That practice exposes New York Life to a situation where an unscrupulous agent could sell policies to persons who end up not paying the full first year premiums, after which the agent resigns from the Company after receiving the advanced commissions.  Unless New York Life maintains a mechanism for recovering the amount

24

overpaid to the agent, such events (or, sometimes, scams) could go unchecked. Consequently, New York Life reserves the right to request that agents pay the negative balance on their ledger by check and the right to take legal action against an agent who departs with a negative ledger balance. This does not prove that Plaintiffs earned compensation prior to ledger reconciliation.

> c.   **Plaintiffs' tired tax withholding argument still lacks merit.**

Contrary to Plaintiffs' assertions, whether income is "gross income" or "wages" under the Internal Revenue Code ("IRC") is distinct from whether income is "earned" under NYLL §193. As the IRC and NYLL §193 each have distinct policy objectives, comparisons under and between these two bodies of law is misplaced. The IRC requires that all amounts paid to an employee are subject to reporting and withholding unless a specific exception applies. 26 U.S.C. §§ 3401(a) and 3402(a); 26 C.F.R. § 1.6041-2. All amounts credited to agents are reported and subjected to withholding unless one of the narrow statutory or regulatory exceptions applies, as in the case of IRC section 401(k) plans or deferred compensation plans. See 26 C.F.R. §§ 1.401(k)-1(a)(4)(iii) and 31.3402(a)-1(b). In light of the broad statutory definition of "income" under the IRC and the absence of a specific statutory exception, New York Life reports as income all amounts credited to agents to ensure that it does not violate applicable tax laws. The agent, of course, is free to add any amounts offset against credits to any other business expenses they incur on IRS Schedule C (or Schedule A) – including ledger and non-ledger business expenses. See Hynes Dep. 182:19-22, Exh. A to Lynch Decl. Moreover, Plaintiffs' argument that if New York Life were to report the credits and debits in a manner inconsistent with applicable provisions under the IRC that the Plaintiffs "would have paid significantly less tax" (Pls' Br. at p. 16) is entirely speculative and irrelevant since the result is a consequence of IRC and not as a result of any affirmative choice made by New York Life.

## IV.     CONCLUSION

For all of the above reasons, New York Life respectfully requests that the Court deny

Plaintiffs' Joint Motion for Partial Summary Judgment in its entirety.

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: ___s/Sean P. Lynch_____

| | |
|---|---|
| Richard G. Rosenblatt (pro hac vice) | Michael L. Banks (pro hac vice) |
| Sean P. Lynch | MORGAN LEWIS & BOCKIUS LLP |
| 502 Carnegie Center | 1701 Market Street |
| Princeton, New Jersey 08540 | Philadelphia, Pennsylvania 19103 |
| Phone: (609) 919-6600 | Phone (215) 963-5387 |
| Fax: (609) 919-6701 | Fax (215) 963-5001 |
| rrosenblatt@morganlewis.com | mbanks@morganlewis.com |
| slynch@morganlewis.com | *Counsel for Defendants* |

26